# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| Pastors Protecting Youth, et al., | ) |
| Plaintiffs, | ) |
| v. | ) No. 16-cv-8034 |
| | ) Judge Ronald A. Guzmán |
| Lisa Madigan, Illinois Attorney General, in her Official Capacity, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION & ORDER

The Court grants Defendant's motion to dismiss [20], and this case is dismissed as nonjusticiable.

## STATEMENT

This case concerns the constitutionality of Illinois' Youth Mental Health Protection Act ("YMHPA" or "the Act"), which generally prohibits mental health providers who practice in "trade or commerce" from engaging in sexual orientation change efforts (i.e., conversion therapy) with minors. 405 Ill. Comp. Stat. § 48/20. Plaintiffs are a group of five Illinois pastors and two unincorporated associations of pastors/churches who believe the YMHPA violates their First Amendment rights. Particularly, they claim the law has chilled their ability to provide "pastoral counseling," such as counseling about sexual identity and homosexuality. Accordingly, Plaintiffs filed the instant case against defendant Lisa Madigan in her official capacity as Illinois Attorney General, seeking a declaratory judgment that pastors (including those who are compensated for their pastoral work) fall outside the YMHPA's definition of "trade or

1

commerce" and therefore cannot be held liable under the Act.[1] Defendant now moves to dismiss pursuant to Rules 12(b)(1) and 12(b)(6). For the following reasons, the Court grants Defendant's motion.

## **LEGAL STANDARD**

For purposes of a motion to dismiss under either Rule 12(b)(1) or Rule 12(b)(6), the court accepts all well-pleaded factual allegations as true and construes all reasonable inferences in the plaintiff's favor. *Scanlan v. Eisenberg*, 669 F.3d 838, 841 (7th Cir. 2012). To survive a Rule 12(b)(6) motion, the complaint must set forth a "'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008) (citations omitted). A Rule 12(b)(1) motion, in contrast, challenges federal jurisdiction, and the plaintiff bears the burden of establishing the elements necessary for jurisdiction, including standing, have been met. *Scanlan*, 669 F.3d at 841-42.

## **ANALYSIS**

Defendant moves to dismiss on several justiciability grounds, but for the sake of analytical clarity the Court will frame its discussion in terms of standing.

Article III Section 2 of the Constitution "limits the 'judicial power' to the resolution of 'cases' and 'controversies.'" *Ind. Right to Life, Inc. v. Shepard*, 507 F.3d 545, 549 (7th Cir. 2007) (citation omitted). A case or controversy requires a claim that is ripe and a plaintiff who has standing. *Id.* Whereas ripeness is concerned with *when* an action may be brought, standing focuses on *who* may bring a ripe action. *Id.* In pre-enforcement challenges such as this case, however, the two concepts tend to merge, and the central question is whether the plaintiff can

---

[1] Technically, the Complaint includes one prayer for relief requesting eight declarations (the first of which is stated above). The remaining relief consists of declarations that the YMHPA, as applied to Plaintiffs and their counselees, violates various portions of the United States Constitution, the Illinois Constitution, and the Religious Freedom Restoration Act.

demonstrate a credible threat of enforcement (or reasonable likelihood of future harm) from the challenged law. *See Wis. Right to Life, Inc. v. Schober,* 366 F.3d 485, 489 (7th Cir. 2004). Put differently, persons who have only speculative fears that a statute will be applied against them are not appropriate plaintiffs. *See Babbitt v. United Farm Workers Nat. Union,* 442 U.S. 289, 298 (1979); *Younger v. Harris*, 401 U.S. 37, 42 (1971).

Here, the crux of Plaintiffs' claim is their belief that the pastoral services they offer are within the meaning of "trade or commerce" in the YMHPA. Put best by Plaintiffs themselves:

> Section 25 of the Act applies to anyone who, in "trade or commerce" offers conversion therapy services. Because the government has traditionally taken an expansive view of "commerce," it is unclear to Plaintiffs whether their counseling services, which they are compensated for as ministers and which are an alternative to professional counseling, are "in trade or commerce."

(Pls.' Br. [Dkt. # 27] at 2.) The YMHPA does not define "trade or commerce," however, which means this case is essentially one of statutory interpretation. To that end, Plaintiffs rely upon (1) the language of the YMHPA, (2) the United States Supreme Court's commerce clause jurisprudence, and (3) other Illinois statutes that define "trade or commerce" to include "services" and acts performed within one's "vocation or occupation" — all of which, on Plaintiffs' account, plausibly suggest that religious counseling is "commerce." The Court finds otherwise.

I.   **The YMHPA's Text and Legislative History**

As a federal court interpreting Illinois law, the Court defers to Illinois' rules of statutory interpretation. *United States v. Woodland*, 607 F. Supp. 2d 904, 911 (C.D. Ill. 2009). In that respect, where a statute has not been judicially interpreted, as is the case here, Illinois courts are guided by both the statute's plain language and the legislative intent behind it. *People v. Hanna*, 800 N.E.2d 1201, 1207 (Ill. 2003); *Lake Cty. Bd. of Review v. Prop. Tax Appeal Bd.*, 548 N.E.2d 1129, 1136 (Ill. App. Ct. 1989).

Section 25 of the YMPHA — the provision under which Plaintiffs fear prosecution — reads as follows:

> No person or entity may, in the conduct of any trade or commerce, use or employ any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact in advertising or otherwise offering conversion therapy services in a manner that represents homosexuality as a mental disease, disorder, or illness, with intent that others rely upon the concealment, suppression, or omission of such material fact. A violation of this section constitutes an unlawful practice under the Consumer Fraud and Deceptive Business Practices Act.

405 Ill. Comp. Stat. § 48/25. According to Plaintiffs, Section 25 "goes beyond regulating licensed 'mental health providers' and instead regulates '*any* person or entity'. . . . [I]t also prohibits any person or entity . . . from 'offering conversation therapy services.'" (Pls.' Br. [Dkt. # 27] at 2.) Thus, they claim that a plain reading of Section 25 threatens pastors with financial liability under the Illinois Consumer Fraud and Deceptive Business Practice Act ("CFA"), 815 Ill. Comp. Stat §§ 505/1-505/12. But there are several problems with this analysis.

Above all, Plaintiff's interpretation fails to consider the language in Section 25 as a whole. Its prohibitions begin with a significant qualifier: "in the conduct of any trade or commerce." 405 Ill. Comp. Stat. § 48/25. Although the YMHPA does not define "trade or commerce," the ordinary meaning of these terms does not suggest they apply to private religious counseling. *See* Black's Law Dictionary (10th ed. 2014) (defining "commerce" as "[t]he exchange of goods and services, esp. on a large scale involving transportation between cities, states, and countries" and defining "trade" as "[t]he business of buying and selling or bartering goods or services.").[2]

---

[2] The Illinois Supreme Court considers Black's Law Dictionary a valid source for determining the ordinary meaning of undefined terms. *See, e.g., People v. Petrenko*, 931 N.E.2d 1198, 1213 (Ill. 2010).

Similarly, Plaintiffs misread Section 25 as prohibiting persons from "offering conversion therapy." This phrase, too, must be read in context. The text preceding "offering conversion therapy" states that no person or entity may (a) use or employ fraud/deception/etc. in "advertising *or* otherwise offering conversion therapy services." 405 Ill. Comp. Stat. § 48/25 (emphasis added). The "or" here is conjunctive rather than disjunctive, meaning that "advertising" and "offering conversion" therapy are one group of actions modified by the preceding clause (a). Moreover, the operative verbs in clause (a) ("use" or "employ") have as their objects various deceptive practices that may occur *in the context of* advertising or offering conversion therapy. That is to say, "offering conversion therapy" is not what is prohibited; instead, Section 25 prohibits persons from deceptively advertising or misrepresenting conversion therapy in the marketplace; an interpretation that marshals support from its very title — "Advertisement and sales; misrepresentation." 405 Ill. Comp. Stat. § 48/25. Taken together, the ordinary meaning of "trade" and "commerce," combined with the above construction of Section 25, renders Plaintiffs' fears of prosecution unfounded.[3]

This conclusion is further supported by a reading of the YMHPA as a whole. Apart from the Act's enumerated purpose, definitions section, and legislative findings, which offer no insight about whether the Act applies to religious counseling, there are only three operative sections:

---

[3] Only one of the plaintiff pastors in this case states that he wishes to advertise his counseling services but has avoided doing so because he fears prosecution under the YMHPA. (*See* Teesdale Decl. [Dkt. # 1, Ex. B] at 2.) Yet his fears, like Plaintiffs' generally, are unfounded because he has not suggested that such advertising would be for commercial purposes (i.e., "in trade or commerce").

5

- Section 20, entitled "Prohibition on Conversion Therapy," which prohibits licensed "mental health providers"[4] from offering conversion therapy to minors. 405 Ill. Comp. Stat. § 45/20;

- Section 30, entitled "Discipline," which provides that mental health providers who engage in conversion therapy with minors may "be subject to discipline by the licensing entity or review board with competent jurisdiction." 405 Ill. Comp. Stat. § 45/30; and

- Section 25, entitled "Advertising and Sales; misrepresentation." 405 Ill. Comp. Stat. § 48/25.

Thus, it is clear that the Act's only penalties apply to mental health professionals or to those who deceptively advertise conversion therapy for commercial purposes. Plaintiffs fit neither mold.

Lastly, to the extent the phrase "trade or commerce" in the YMHPA is ambiguous, its legislative history[5] resolves any doubt. The co-sponsors of the bill creating the Act expressly stated that it does not apply to religious counseling. *See* Senate Hr'g on H.B. 217, Ill. 99th Gen. Assem., Sen. Tr. at 48 (May 29, 2015) (Stmt. of Sen. Biss) ("Here's what [the bill] does: It affects minors only and it affects licensed professionals only . . . . It doesn't ban therapy . . . . It doesn't address religious or non-licensed professionals. It simply says that licensed professionals can't engage in [conversion therapy] with minors."); *id.* at 65 (Stmt. of Sen. Koehler) ("That's right. This bill does not apply at all to a member of the clergy."). As such, Plaintiffs' fears of

---

[4] "Mental health provider" means "a clinical psychologist licensed under the Clinical Psychology Licensing Act; a school psychologist as defined in the School Code; a psychiatrist as defined in Section 1-121 of the Mental Health and Developmental Disabilities Code [405 ILCS 5/1-121]; a clinical social worker or social worker licensed under the Clinical Social Work and Social Work Practice Act [225 ILCS 20/1 et seq.]; a marriage and family therapist or associate marriage and family therapist licensed under the Marriage and Family Therapy Licensing Act [225 ILCS 55/1 et seq.]; a professional counselor or clinical professional counselor licensed under the Professional Counselor and Clinical Professional Counselor Licensing and Practice Act [225 ILCS 107/1 et seq.]; or any students, interns, volunteers, or other persons assisting or acting under the direction or guidance of any of these licensed professionals." 405 Ill. Comp. Stat. § 45/15.

[5] In ascertaining the meaning of ambiguous statutory language, it is appropriate to use extrinsic material such as legislative history. *See Solon v. Midwest Med. Records Ass'n, Inc.,* 925 N.E.2d 1113, 1119 (Ill. 2010).

prosecution lose all significance when considered against the statute's plain language and its legislative history. *See Word of Faith World Outreach Ctr. Church, Inc. v. Morales*, 787 F. Supp. 689, 697 (W.D. Tex. 1992), *rev'd on other grounds,* 986 F.2d 967 (5th Cir. 1993) (interpreting a similar anti-conversion-therapy statute and concluding that it does not apply to religious counseling).

## II.     Other Sources of Meaning

Still, given that the phrase "trade or commerce" is undefined in the YMHPA, Plaintiffs further insist that it could be applied against them because (1) the Supreme Court's commerce clause jurisprudence shows that the government has traditionally taken an expansive view of "commerce" and (2) other Illinois statutes define "trade or commerce" in a way that plausibly places religious counseling within their scope. Not so.

**(A)**     *Commerce Clause Cases*

Plaintiffs rely on two commerce clause cases: *Wickard v. Filburn*, 317 U.S. 11, 125 (1942) (holding that Congress's power to regulate "commerce" extends to in-home activities that have an "indirect effect" on trade, viz., home-grown wheat) and *Nat'l Fed'n of Indep. Bus v. Sebelius*, 132 S. Ct. 2566, 2621-22 (2012) (Ginsburg J., dissenting) (suggesting that commercial "inactivity" falls within Congress's regulatory power under the commerce clause). These holdings do not speak for themselves, however, and Plaintiffs have failed to make any argument connecting them to the facts of this case — a shortcoming that runs dangerously close to waiver.

More to the point, neither case so much as hints that Congress may regulate religious counseling under the commerce clause, and their facts are easily distinguishable. Wheat, for example, is a fungible good that can be bought and sold in a marketplace. And the "inactivity" referred to in *National Federation of Independent Businesses* was an individual's refusal to

participate in the Affordable Care Act, where the failure to participate in the market had a clear causal impact on the viability of the marketplace itself (the insurance industry). 132 S. Ct. at 2622. The same cannot be said of religious counseling. Plaintiffs have not suggested that they market their services for a fee or sell a product, so they are not market participants. Indeed, all they allude to by way of economic activity is how they are compensated for their services (donations). Yet the very nature of donations is *charity*, not a quid pro quo for goods or services. Accordingly, the government's "expansive view" of commerce has no application here. *See Doe v. Holy See*, 557 F.3d 1066, 1097 (9th Cir. 2009) (Fernandez, J., concurring) ("Is hearing confessions and giving religious advice -- an age-old function of churches -- really no more than a commercial activity similar to psychological counseling? . . . . I think not. Normal legal usage and common sense recoil from these possibilities.").

**(B)** *Other Illinois Statutes*

Finally, Plaintiffs rely on inapposite portions of the CFA and the Illinois Uniform Deceptive Trade Practices Act ("UDTPA"), 815 Ill. Comp. Stat. §§ 501/1-501/7, to ground their claim that "trade and commerce" could apply to religious counseling. Particularly, they note that (1) the CFA defines "trade or commerce" to include the "distribution of *services*" that may "directly or indirectly affect[]" Illinois citizens, and that (2) the UDTPA enumerates certain "services" that are deceptive as a matter of law, which supports Plaintiffs' fear that religious services are commerce. (Pls.' Br. at 2.) Neither argument succeeds.

To be sure, Plaintiffs' CFA argument has some purchase. The statute defines "trade" and "commerce" as "the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situated, and shall include any trade or commerce directly or indirectly

affecting the people of this State." 815 Ill. Comp. Stat. § 505/1. This could be taken to mean that the CFA covers advertising or offering religious services. But the way the CFA has been interpreted by Illinois courts counsels against this result. Although no Illinois court has considered this precise issue, they have nonetheless interpreted the terms "trade" and "commerce" in the CFA to exclude professional services such as the practice of law, medicine, and dentistry — with the rationale being that those services do not involve the typical buyer/seller relationship contemplated by the CFA. *See Tkacz v. Weiner*, 858 N.E.2d 514, 517 (Ill. App. Ct. 2006); *Feldstein v. Guinan*, 499 N.E.2d 535, 538 (Ill. App. Ct. 1986). That rationale applies doubly so in this case, since Plaintiffs' *private*, *free* religious counseling services are even further removed from commerce than, say, law and medicine.[6]

The UDTPA is similarly of no moment. Plaintiffs rely on Section 2, which provides that "[a] person engages in deceptive trade practice when, in the court of his or her business, vocation, or occupation, the person . . . . (5) represents that goods or *services* have sponsorship . . . . (7) represents that goods or *services* are of a particular standard . . . . (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding." 815 Ill. Comp. Stat. § 505/2 (emphasis added). Nothing in Section 2, however, defines "trade or commerce," and Plaintiffs have not made any argument explaining why the UDTPA's enumerated deceptive trade practices are probative of the meaning of "trade and commerce" in the YMHPA (a separate statute in a distinct section of the Illinois code). Indeed, the only remote overlap between the two

---

[6] The Court further notes that while Illinois courts sometimes look to other statutes' definitions to construe the meaning of an undefined term (e.g., the YMHPA's "trade or commerce" vs. the CFA's "trade" and "commerce"), this method of interpretation is typically used only when more-primary sources of meaning are unhelpful (e.g., plain language or legislative intent). *See In re Application for Tax Deed*, 723 N.E.2d 1186, 1190 (2000) ("There is a limit to the use of a definition from another statute because words must be construed in the context in which they are presented."). Given the preceding discussion of the YMHPA's language and legislative history, the Court finds the CFA's definitions of "trade" and "commerce" to be of limited value.

statutes is the term "services." But without any principle or case law connecting *commercial* services and *religious* services, Plaintiffs' argument simply doesn't get off the ground.

In the end, the entirety of Plaintiffs' case rests on a mistaken interpretation of the law, and the Court therefore finds that their fears of prosecution are too remote to support standing. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1555-56 (2016) (explaining that abstract, perceived harm cannot substitute for the concrete injury required by Article III).

## **CONCLUSION**

For the reasons set forth above, the Court grants Defendant's motion to dismiss [20], and this case is dismissed as nonjusticiable.

**SO ORDERED.**                                      ENTERED:  February 15, 2017

_____
**HON. RONALD A. GUZMÁN**
**United States District Judge**